HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANTHONY BALLENGER,

Defendant.

CASE NO. CR16-5535RBL

ORDER

THIS MATTER is before the Court on Defendant's Emergency Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1).  [Dkt. #306].  The Court has reviewed the materials filed for and against said motion.  Oral argument is not necessary.  For the reasons stated below, the motion is **DENIED**.

## I. FACTS

On June 16, 2017, this Court sentenced Anthony Ballenger ("Ballenger") to a seventy-six (76) month term of imprisonment following his guilty pleas to charges of unauthorized access to a protected computer, aggravated identity theft, and conspiracy to distribute oxycodone. *See* Judgment, Dkt. 139.  Ballenger devised and led a sophisticated prescription-forgery conspiracy that relied on digital crimes, identity theft, and an opioid-

distribution network.  Ballenger's criminal history consists of other identity theft and drug offenses, including a 2009 conviction for stealing his employer's car, installing flashing lights, impersonating a law enforcement officer, and pulling over civilians.

Ballenger is currently serving his term of imprisonment at Terminal Island FCI. His expected release date is January 27, 2023.

**A. Ballenger's Motion**

On May 11, 2020, Ballenger filed a *pro se* Motion for Compassionate Release. [Dkt. #301].  Following the appointment of CJA counsel James Feldman, Ballenger's appointed counsel filed a second Motion seeking the same relief.  For simplicity, Ballenger's two motions seeking the same relief are collectively referred to herein as the "Motion."

Ballenger claims he is entitled to compassionate release because of complications arising from Crohn's disease, urinary tract infections, and bladder disease.  As his medical records reflect, Ballenger has received extensive medical treatment for all of these conditions throughout his time as a federal inmate, but has not sought compassionate release before this year.

Ballenger asserts that his conditions place him at greater risk of contracting COVID-19.  Specifically, relying on the declaration of Doctor Marc Stern, a correctional health care consultant, Ballenger claims that his consumption of an immunosuppressant to treat his Crohn's Disease places him at higher risk of contracting COVID-19.  His medical records show that he tested positive for COVID-19 on April 23, 2020 and later

tested negative on May 13, 2020, which suggests that he has contracted and recovered from the virus since the outbreak began.

Ballenger also asserts that he cannot receive adequate treatment for his medical conditions because the medical system is overburdened by the needs of COVID-19 patients.  He refers to a purported episode in which the Bureau of Prisons (BOP) failed to provide him with medicine to treat kidney stones.  In actuality, his medical records show that he consistently has received care from qualified medical providers after seeking medical attention.

Ballenger's Motion does not cite any other facts that support his request for compassionate release. Indeed, he acknowledges that he is only "33 years old", and that the BOP's medical system has repeatedly treated his recurring medical conditions. Following the most recent medical encounter set forth in his medical records, the physician who treated Ballenger noted that he "appears well," is "alert and oriented," that his nutrition was "within normal limits." The physician also noted that Ballenger's pulmonary, cardiovascular, abdominal, and gastrointestinal functions were normal.

## II. ANALYSIS

### A.  The Legal Standards for Compassionate Release

As amended by the First Step Act of 2018, 18 U.S.C. § 3582(c)(1)(A) now permits an inmate satisfying certain conditions to file a motion with the district court seeking "compassionate release." As relevant to the defendant's motion, the statute now reads:

> (c) The court may not modify a term of imprisonment once it has been imposed except that—

(1) in any case—

   (A) the court, upon motion of the Director of the Bureau of Prisons, or
       upon motion of the defendant after the defendant has fully exhausted
       all administrative rights to appeal a failure of the Bureau of Prisons
       to bring a motion on the defendant's behalf or the lapse of 30 days
       from the receipt of such a request by the warden of the defendant's
       facility, whichever is earlier, may reduce the term of imprisonment
       (and may impose a term of probation or supervised release with or
       without conditions that does not exceed the unserved portion of the
       original term of imprisonment), after considering the factors set forth
       in section 3553(a) to the extent that they are applicable, if it finds
       that—

           (i) extraordinary and compelling reasons warrant such a
           reduction; or

                                    * * *

and that such a reduction is consistent with applicable policy statements
issued by the Sentencing Commission; . . . .

18 U.S.C. § 3582(c)(1)(A). Congress directed the Sentencing Commission to draft the

policy statement referenced in this statute in 28 U.S.C. § 994(f), which statute provides:

   The Commission, in promulgating general policy statements regarding the
   sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall
   describe what should be considered extraordinary and compelling reasons for
   sentence reduction, including the criteria to be applied and a list of specific
   examples. Rehabilitation of the defendant alone shall not be considered an
   extraordinary and compelling reason.

That policy statement, found at USSG § 1B1.13, provides:

   Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. §
   3582(c)(1)(A), the court may reduce a term of imprisonment (and may
   impose a term of supervised release with or without conditions that does not
   exceed the unserved portion of the original term of imprisonment) if, after
   considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that
   they are applicable, the court determines that—

   (1) (A) Extraordinary and compelling reasons warrant the reduction;

(B) The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2) The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) The reduction is consistent with this policy statement.

As directed by 28 U.S.C. § 924(t), the Application Notes define what constitute "extraordinary and compelling reasons" to support a reduction in sentence. Specifically, application note 1 provides that extraordinary and compelling reasons exist under the following circumstances:

(A) Medical Condition of the Defendant.—

(i)     The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii)    The defendant is—

(I)     suffering from a serious physical or medical condition,

(II)    suffering from a serious functional or cognitive impairment, or

(III)   experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant.--The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of

the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less

USSG § 1B1.13 cmt. n.1.

The Application Note also provides that extraordinary and compelling reasons may include certain described family circumstances, or other reasons as determined by the Director of the Bureau of Prisons. USSG § 1B1.13 cmt. n.1. The Application Notes then state that "[t]he court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction), after considering the factors set forth in 18 U.S.C. § 3553(a) and the criteria set forth in this policy statement, such as the defendant's medical condition, the defendant's family circumstances, and whether the defendant is a danger to the safety of any other person or to the community." USSG § 1B1.13 cmt. n.4.

*1. The Policy Statement at USSG § 1B1.13 Is Binding.*

Based on the text of § 3582(c)(1)(A), the policy statement referenced in § 3582(c)(1), like that referenced in 18 U.S.C. § 3582(c)(2), *see* USSG § 1B1.10, is binding on this Court and controls how this Court is to exercise of discretion. *Cf. Dillon v. United States*, 560 U.S. 817, 827 (2010). In *Dillon*, the Supreme Court addressed the identical language if "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission" contained in 18 U.S.C. § 3582(c)(2). The Court held that based on this language, the Commission's pertinent policy statement is binding on district courts and any limitations contained in that Guideline is a limitation a district court's discretion to reduce sentences. *See Dillon*, 560 U.S. at 826. The Court emphasized that a

sentence reduction under Section 3582(c)(2) "represents a congressional act of lenity intended to give prisoners the benefit of later enacted adjustments to the judgments reflected in the Guidelines." *Id.* at 828.

Section 3582(c)(1)(A), like the companion statutory provision addressed in Dillon, also rests on a limited act of Congressional lenity. And both subsections follow the same prefatory language of Section 3582(c) that makes unassailably clear that a court may only "modify a term of imprisonment once it has been imposed" under the limited circumstances set out in these two subsection. Given the parallel nature of the two provisions, there is no reason to conclude that the policy statement applicable to § 3582(c)(1)(A) is other than binding.

The fact that USSG § 1B1.13 has not been amended after enactment of the First Step Act does not alter that conclusion. Although the First Step Act removed the limitation that a motion could only be filed by the Director of the Bureau of Prisons, that did not change any of the statutory standards for relief, or suggest that there should be a broader interpretation of what constitutes an "extraordinary and compelling reason" beyond what is stated in the policy statement. Nor did Congress direct the Sentencing Commission to change or expand this policy statement. Rather, Congress simply made it possible for a defendant to file a motion rather than retaining the Bureau of Prisons as the gatekeeper. *See United States v. Ebbers,* 2020 WL 91399, *4 (S.D.N.Y. Jan. 8, 2020) ("Congress in fact only expanded access to the courts; it did not change the standard.").

As such numerous courts have found, this policy statement is still binding and must guide this Court's determination of whether the facts that the defendant

has presented constitute "extraordinary and compelling reasons" and what situations other than a defendant's medical condition might constitute such a reason (citations omitted).

Regardless of whether it is binding, courts have observed that the guidance is helpful regarding what circumstances constitute extraordinary and compelling reason to disturb the finality of a sentence. *See, e.g., United States v. Mitchell,* No. 2:12-CR-0401 KJM, 2020 WL 2770070, at *2 (E.D. Cal. May 28, 2020); *United States v. Esparza,* No. 1:07-CR-00294-BLW, 2020 WL 1696084, at *2 n.2 (D. Idaho Apr. 7, 2020); *United States v. Gonzalez,* No. 2:18-CR-0232-TOR-15, 2020 WL 1536155, at *2 (E.D. Wash. March 31, 2020); *United States v. Rivernider*, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019. This is particularly true where Congress chose not to disturb this policy statement or expand the understanding of what constitutes extraordinary and compelling circumstances when it amended this provision in the First Step Act.

Thus, before this Court may reduce the defendant's sentence, applying the guidance in USSG § 1B1.13, this court first must determine whether the reasons the defendant has provided are "extraordinary and compelling." And if the court concludes such a reason or reasons have been provided, this Court must then consider whether a reduction in sentence is appropriate in light of the factors in 18 U.S.C. § 3553(a) and the danger that the defendant might continue to present to another person or the community.

**B. Ballenger Has Not Met the Standard for a Reduction in Sentence.**

Because more than thirty days have passed since Ballenger made his request for compassionate release to the warden on January 17, 2020, this statutory prerequisite has

been met. But having passed this hurdle is only step one. To qualify for a sentence reduction, Ballenger still bears the burden to show "extraordinary and compelling reasons" that meet the high bar set by Congress and the Sentencing Commission for compassionate release to be granted in order to be eligible for a district court's discretionary consideration of a reduced sentence under this provision. *See Riley v. United States*, No. C19-1522 JLR, 2020 WL 1819838 at *7 (W.D. Wash. Apr. 10, 2020); *United States v. Greenhut*, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020) (holding that defendant bears the burden of establishing entitlement to sentencing reduction and citing *United States v. Sprague*, 135 F.3d 1301, 1306-07 (9th Cir. 1998)).

As set out above, Ballenger relies on two facts in support of his request for a sentence reduction: (1) his chronic medical conditions, which Ballenger claims cannot adequately be treated by the BOP's medical system; and (2) the increased risk of COVID 19 posed by Ballenger's consumption of an immunosuppressant to treat his Crohn's disease. Neither fact comes close to being an "extraordinary and compelling" circumstance that warrants compassionate release.

### 1. Ballenger's Health Conditions.

While Ballenger's chronic medical conditions warrant sympathy, they do not give rise to the extraordinary and compelling reasons necessary to justify a sentence reduction. As Ballenger explains, he suffers from Crohn's disease and persistent bladder conditions that have required the use of different types of catheters over the last several months. These indisputably are chronic conditions that have caused Ballenger significant distress, but they do not meet the standard for compassionate release. As the court explained in

*United States v. Ayon-Nunez*, "[t]o be faithful to the statutory language requiring 'extraordinary and compelling reasons,' it is not enough that Defendant suffers from . . . chronic conditions that [he] is not expected to recover from. In general, ***chronic conditions that can be managed in prison are not a sufficient basis for compassionate release***." 2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020) (emphasis added) (rejecting a claim for compassionate release from a defendant suffering from severe back injuries and epilepsy); *United States v. Christopher Luck,* 2020 WL 3050762, at *2 (N.D. Cal. June 8, 2020) (same); *Riley v. United States*, 2020 WL 1819838, at *7 (W.D. Wash. Apr. 10, 2020)*United States v. Mangarella*, 2020 WL 1291835, at *2–3 (W.D.N.C. Mar. 16, 2020) ("[A] compassionate release . . . is an extraordinary and rare event." (citation omitted)).

The BOP's medical staff obviously can (and has) managed Ballenger's chronic medical conditions. Ballenger's medical records show that he has had these conditions throughout his time in federal custody. As Ballenger acknowledges, BOP has hospitalized him "numerous times" for these conditions, and has treated him using a variety of techniques, including two different types of catheters.  His medical records reflect the effectiveness of BOP's treatment regime in ensuring that Ballenger is able to continue to reside in federal prison facilities and participate in prison programming. Notably, in the most recent medical visit documented in Ballenger's medical records, the treating physician found that Ballenger's pulmonary, cardiovascular, and gastrointestinal conditions were normal.

In short, Ballenger's chronic conditions do not come close to the standard for "extraordinary circumstances" that other courts have applied when granting motions for compassionate release. *See United States v. Johns*, 2019 WL 2646663, at *2–3 (D. Ariz. June 27, 2019) (granting reduction after 23 years of imprisonment for 81-year-old defendant with multiple serious medical conditions, including "severe heart disease" and a stroke from which he was not likely to recover, who had substantially diminished ability to provide self-care within the BOP). As those other courts have explained, viewing compassionate release too expansively could yield significant sentencing disparities. *Ebbers*, 2020 WL at *6 (S.D.N.Y. Jan. 8, 2020). Compassionate release is not a tool to "correct" a judgment. *Id.* Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where detention would otherwise be warranted. *See, e.g., United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008) (citing various pre-trial detention cases).

Finally, Ballenger's suggestion that BOP's medical staff is too "overwhelmed" to treat his conditions as a result of demands imposed by the COVID-19 outbreak is baseless. Nothing in his medical records reflects that BOP medical staff was ineffective or tardy in treating his medical conditions.

### 2. COVID-19 and the BOP Efforts to Address the Spread of This Disease.

Ballenger also cites his use of immunosuppressant drugs as a basis for release. Ballenger's worry about contracting COVID-19 is certainly understandable, but his medical records show that he has already contracted and recovered from the

virus. Moreover, because of the COVID-19 pandemic, BOP is using its authorities under 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541(g) to reduce the inmate population and to place qualifying particularly vulnerable inmates into home confinement. The Attorney General issued directives to BOP on March 26 and April 3, 2020, to begin reviewing all inmates who have COVID-19 risk factors, as described by the Centers for Disease Control and Prevention (CDC), to determine which inmates would be suitable for release to home confinement to protect the health and safety of both inmates and personnel at BOP institutions.

BOP has implemented measures to mitigate the spread of COVID-19 among federal inmates, including through increased testing. Moreover, as reflected by his medical records, in the four months since the start of the COVID-19 outbreak, Ballenger has already contracted and recovered from COVID-19. Thus, Ballenger's use of immunosuppressants is not an extraordinary and compelling reason for early release.

### 3. FCI Terminal Island and Ballenger's Status.

The United States acknowledges that Ballenger is being held at one of the BOP facilities which has experienced an outbreak of COVID-19. Indeed, much of the motion is directed at conditions at FCI Terminal Island where the defendant is currently housed. Pointing to the class action law suit and habeas petition filed by three inmates at FCI Terminal Island and the self-serving declarations that were attached, *see Wilson v. Ponce*, 20-CV-4451-MWF-MRW, (C.D. Cal.), the defense argues that this establishes that he is at great risk if this Court does not grant his motion for release. What is absent from that

recital is any discussion of significant efforts that have been made at this and other BOP institutions to ensure the health and safety of inmates in BOP care.

The declaration by Ronell Prioleau, the Associate Warden at FCI Terminal Island, attached to the respondent's opposition to the motion for a temporary restraining order and preliminary injunction provides extensive details regarding the efforts made to address the COVID-19 pandemic. The declaration describes in detail all the specific steps taken at Terminal Island to stop the spread of this virus. One step has been screening. Since early March, 2020, all arriving inmates both for COVID-19 symptoms, and for exposure risk factors such as whether the inmate had traveled through an area where COVID-19 was known to be rapidly spreading. Inmates were then quarantined for 14 days before being released to the general population.

Further, all inmates at the institution have been screened for illness at least daily through the use of temperature and symptom checks. The same is true for staff and any visitors permitted onto the facility. And, through increased testing equipment the facility has obtained and assistance from the Los Angeles County Department of Public Health, all inmates at this institution have been tested at least once for COVID-19. Although, this has resulted in the discovery of a significant number individuals who have tested positive for the disease, it also assisted in disease control since it allowed for the identification of asymptomatic individuals who could spread the disease. As a result, as of June 1, 2020, of the 1002 inmates housed at this facility, 26 are listed as testing positive, and 663 are described as recovered. Sadly during the course of the last three

months, 9 inmates have died.  And inmates testing positive are obviously quarantined and their health monitored.

Beyond screening and testing, a number of other measures also have been taken. The institution has made sure that inmates have access to sinks, water, and soap at all times.  Common areas are disinfected daily and cleaning supplies are stocked for use for that purpose and for inmates to use in cleaning their cells.  Inmates are provided one surgical mask per week and three cloth masks which they are required to wear. Similarly, staff receive two surgical masks and three cloth masks which they are required to wear.

As further support for his motion, the defendant also cites the decisions by the district court in litigation regarding FCI Elkton in the Northern District of Ohio. *See Wilson v. Williams*, 20-Civ-794, Dkt. 1, (N.D. Ohio). In its initial order, the district court directed the BOP to evaluate each inmate exhibiting a risk factor identified by the Centers for Disease Control and Prevention (CDC) to determine their eligibility for compassionate release, parole or community supervision, transfer furlough, or non-transfer furlough. *Wilson v. Williams*, 2020 WL 1940882, at *11 (N.D. Ohio Apr. 22, 2020). As noted by the defense, the Sixth Circuit denied the government's motion to stay this order and the Supreme Court declined to "stay the District Court's April 22 preliminary injunction without prejudice to the Government seeking a new stay if circumstances warrant." *Williams v. Wilson*, _ S. Ct._, 2020 WL 2644305 (May 26, 2020). However, the Court did not deny the stay of the merits but rather declined to issue a stay because the district court had issued a new May 19, 2020 order enforcing the

injunction and imposing new measures which the government had not yet appealed. That appeal has since been filed. *Williams v. Wilson*, Sixth Circuit Case No. 20-3547. And while the Sixth Circuit again denied a stay, on June 4, 2020, the Supreme Court entered an order staying both district court ordered pending the government's appeal. *See Williams v. Wilson*, Case No. 19A1047.

But at bottom, the ongoing litigation regarding FCI Elkton and FCI Terminal Island does not purport to resolve the question of whether an individual defendant is eligible for compassionate release. Rather, however, that the principal questions at issue in both the cases is the jurisdiction to enter the orders entered and requested which essentially seek changes regarding the management of the prison.  Thus, this litigation adds little to this issue before this Court.

### A. The § 3553(a) Factors Don't Support the Defendant's Release and the Defendant Has Failed to Establish He is No Longer a Danger

In any event, having risk factors for COVID-19 is not the only factor that this Court must consider. Rather, even if the Court concludes that the defendant's medical issues coupled with the existence of COVID-19 at the institution, constitute extraordinary and compelling circumstances, this court must still determine whether a reduction in sentence is warranted by applying the factors in 18 U.S.C. § 3553(a) along with consideration of whether this defendant continues to present a danger to the community. Here, every one of those factors weighs against Ballenger's release.

In his motion, Ballenger minimizes his extensive criminal history and claims he poses no danger to the community. In truth, Ballenger's role as the leader of a

sophisticated prescription-forgery and opioid-distribution scheme resulted in the distribution of tens of thousands of Oxycodone pills to users in this District. The offense contributed to addiction, health hazards, and the degradation of communities. Ballenger's use of sophisticated tools, including identity theft and unauthorized computer access, to carry out the scheme also compromised innocent doctors, pharmacies, and prescription-delivery networks.

Ballenger's lengthy criminal history reveals that he is a recidivist with the potential to engage in other crimes upon his release from custody. Ballenger's prior convictions include the violation of a no-contact order, fourth-degree assault, criminal impersonation of a law-enforcement officer, and a separate state-law conviction for forging prescriptions. Although he claims that he is not a violent offender, the offense conduct giving rise to those prior convictions reveals that he has a history of sociopathic behavior and no respect for the rule of law. Indeed, he committed the offenses giving rise to this conviction *while serving a term of community custody* under Washington State's Drug Offender Sentencing Alternative program. His track record simply does not support his claim that he is entitled to be placed on supervised release in lieu of serving the second half of his term of imprisonment.

The applicable Sentencing Guidelines range and concerns about sentencing disparity also weigh against Ballenger's motion. As set out in the government's sentencing memorandum, Ballenger's sentencing guidelines range was 151-188 months; his seventy-six month term of imprisonment already falls well below the low end of that range. Moreover, Ballenger's deputy in the conspiracy, Stosh

Satkowski, was sentenced to an eighty-four month term of imprisonment on January 5, 2018. Thus, if this Court were to release Ballenger now, he would effectively have served a term of imprisonment that is a mere quarter of the length of the low end of his guideline range and substantially below the term of imprisonment being served by his primary co-conspirator.   The Court will not accede to Ballenger's wishes.

### III. CONCLUSION

For all of these reasons, Ballenger's Motion for Compassionate Release [Dkt. #306] is **DENIED**.

Dated this 26th day of June, 2020.

Ronald B. Leighton
United States District Judge